SAVE OUR WETLANDS, INC.,
Plaintiff-Appellant,

v.

Colonel Thomas SANDS, etc., et al.,
Defendants-Appellees. (Two cases)

Nos. 81–3304, 81–3556.

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 6, 1983.

Peter D. Derbes, Luke Fontana, Frank Silvestri, New Orleans, La., for plaintiff-appellant.

John Volz, U.S. Atty., William F. Baity, Asst. U.S. Atty., New Orleans, La., Martin W. Matzen, Edward J. Shawaker, Attys., Dept. of Justice, Washington, D.C., for Sands, et al.

Monroe & Lemann, Eugene G. Taggart, McChord Carrico, New Orleans, La., for Louisiana Power and Light.

Before CLARK, Chief Judge, THORN-BERRY and RANDALL, Circuit Judges.

CLARK, Chief Judge:

Save Our Wetlands, Inc., a nonprofit Louisiana corporation, filed this suit in an effort to block the construction of a 25-mile long electric transmission line along the west bank of the Mississippi River. The organization appeals from a district court dismissal of the complaint under Rule 41(b) of the Federal Rules of Civil Procedure. We affirm.

I. The Facts

In 1969, Louisiana Power and Light Company (LP & L) began acquiring property for the right-of-way for a transmission line corridor between Taft, Louisiana and Westwego, Louisiana along the west bank of the Mississippi River. Westwego is the site of a company switching station from which power is provided to the metropolitan area of New Orleans. The corridor would eventually accommodate three lines, one 500 kilovolt and two 250 kilovolts. In 1979, upon obtaining all of the necessary rights-of-way for the project, the utility filed an application for section 10[1] and section 404[2] permits with the New Orleans District of the U.S. Army Corps of Engineers. The section 10 permit was sought because the transmission lines will cross three navigable waterbodies (Bayou Verrett, Cousins Canal, and an unnamed waterway).[3] The section 404 permit was sought because of a concern that the removal of debris cleared from the corridor might be considered a discharge of dredged or fill material into navigable waters.

The corridor will transverse 214 acres of wooded wetland and 244 acres of nonwooded wetland. The wooded wetland will have to be cleared and the utility has decided to windrow the fallen trees and sheared limbs. The windrows will be constructed along one side of the corridor and the timber and vegetation will be allowed to deteriorate at a natural rate. Herbicides approved by the Environmental Protection Agency will be used to stunt the growth of vegetation to prevent interference with the transmission lines. No herbicide runoff in the adjacent wetlands is anticipated.

When the utility submitted its permit applications, it also submitted an Environmental Assessment which was prepared by Dr. Ronald H. Kilgen. Dr. Kilgen, a professor

---

1. Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, provides:

 Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in

 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers

 and authorized by the Secretary of the Army prior to beginning the same.

2. Section 404 of the Clean Water Act, 33 U.S.C. § 1344, provides in relevant part:

 The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

3. Section 10 permits are required for "all structures or work in or affecting navigable waters of the United States...." 33 C.F.R. § 322.3 (1979). Power transmission lines are included in the definition of structures. 33 C.F.R. § 322.2(b) (1979). Navigable waters are those waters "subject to the ebb and flow of the tide shoreward to the mean high water mark ..., and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce." 33 C.F.R. § 322.2(a) (1979).

at Nichols State University, was hired by the utility to prepare the assessment [4]. The assessment reviewed three alternative routes suggested by LP & L and found them to be inadequate. Alternate route one followed an existing right-of-way on which two transmission lines run. It was rejected because additional land would have to be purchased in high-use residential and commercial areas and because multiple transmission lines in one corridor create a high risk of power outage due to hurricanes and tornadoes. The second alternative followed Louisiana Route 3127 to U.S. Highway 90. The assessment rejects the alternative as being aesthetically and environmentally unacceptable. The third alternative ran along the same line on the proposed corridor except for a portion which would run to the south of the proposed corridor. It was rejected because it would put transmission lines between an eagle's nest and the eagles' natural feeding area. The route would also be closer to the feeding area of thousands of lesser scaup and would ruin the aesthetic value of wooded levees lining the Louisiana Cypress Lumber Canal.

The Corps, based upon the assessment, made a preliminary judgment that the project's environmental effects were not significant enough to warrant an environmental impact statement. On April 27, 1979, the Corps issued an initial "Findings of Fact" in which it announced that no

4. The district court summarized the assessment's findings as follows:

(a) No chemicals will be used to clear the right-of-way for construction. Approved herbicides (meaning those that are registered with the EPA, the use and application of which are approved by the appropriate State agency) will be used for the maintenance of the wooded portion of the right-of-way. There will be no herbicide run-off in the adjacent wetlands.

(b) The State of Louisiana Stream Control Commission (now the Water Quality Division of the Office of Environmental Affairs of the Department of Natural Resources) certified on November 9, 1978, that it is reasonable to expect that water quality standards of Louisiana provided for under § 303 of P.L. 92–500 (Federal Water Pollution Control Act) will not be violated by this proposed project.

(c) No adverse impact on ducks is expected. When passing over the proposed route, the ducks fly at an altitude of several hundred feet and would avoid the transmission conductors, the electrical field, and the large support structures will also warn the ducks and other birds to avoid collision with the transmission lines.

(d) The Louisiana Wildlife and Fisheries Commission, which has management of the Salvador Game Management Area, stated it had no objection to the proposed route of the transmission lines and that it would not be detrimental to the success of eagle nests in the area, provided that construction activity be restricted to the period of time when the birds are not at Salvador.

(e) The Louisiana Wildlife and Fisheries Commission owns and controls a large area of the land through which the transmission lines must traverse in order to get from the west to the east in St. Charles and Jefferson Parishes.

(f) The proposed right-of-way was selected by the applicant after consultation with the Louisiana Wildlife and Fisheries Commission as to where the Commission would approve the location and grant the right-of-way across the property.

(g) The proposed project will have no appreciable impact on water quality, surface run-off, or drainage patterns. The Board of Commissioners of the Lafourche Basin Levee District certified under its letter of November 9, 1978, that it had no objection to the proposed project. The Office of Public Works, State of Louisiana, Department of Transportation and Development, in its letter of November 8, 1978, stated that it had no objection to the proposed project.

(h) The transmission lines and support structures are not high enough to interfere with the criteria of the Federal Aviation Administration.

(i) The electrical field beneath the transmission lines will have no discernible impact on humans or human activities.

(j) The clearing of the right-of-way will eliminate the normal habitat in the immediate area, but will improve the habitat diversity of the area. The log piles will provide shelter for many species, such as insects, mice and rats, snakes, rabbits, raccoons, and opossums. These species will experience a growth in population due to an increase of the favorable habitat. In turn, other animals dependent on these species for food will also become more abundant. The rabbit population will probably experience a rapid growth, thereby offering more recreational opportunities in the form of hunting.

(k) The 500 KV transmission line, which will be constructed along the proposed route, will cost $17.3 million.

(record citations omitted).

environmental impact statement was necessary, but noted that this was subject to change should additional information be brought to its attention. On May 8, 1979, the Corps issued a public notice of LP & L's pending permit application describing the nature and location of the proposed project.[5] The notice stated the Corps' view that no environmental impact statement was needed. It was circulated to more than 2,000 organizations and individuals and called for comments until June 7, 1979. Save Our Wetlands submitted no comments and no request was made for a public hearing. The Corps replied to at least one response and then, on August 24, 1979, it issued its final Finding of Fact affirming its early determination that no environmental impact statement was necessary. The section 10 permit was issued to LP & L on September 24, 1979.

Save Our Wetlands filed suit on March 19, 1980 challenging the issuance of the section 10 permit and alleging that the project required a section 404 permit. The organization sought to have the work enjoined until an environmental impact statement was completed. The case was tried before a district judge who granted the defendants' motion for involuntary dismissal under Rule 41(b) of the Federal Rules of Civil Procedure after Save Our Wetlands had completed its case. The organization appeals. .

## II. Standing

We must consider first LP & L's contention that Save Our Wetlands does not have standing to present this claim. The company contends that under the Administrative Procedure Act, the plaintiff must allege and show that it is adversely affected or aggrieved by the agency's action. 5 U.S.C. § 702. The organization alleged here that

its members' economic and recreational use of the area may be permanently compromised by the electric transmission wires. LP & L argues that the organization failed at trial to show any harm. In addition, the utility alleges that Save Our Wetlands' Articles of Incorporation relate to the use of areas on the east bank of the river and that no member testified about their use of the transmission line corridor area. Save Our Wetlands points out, however, that Mrs. Janet Moulton, its president, testified that she went fishing on the west bank in the area of Paradis Canal which is approximately a half mile from the proposed line.

■ Organization may have standing to sue on behalf of their members if they meet the "aggrieved" party standard of section 10 of the Administrative Procedure Act, 5 U.S.C. § 702. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). An organization will have standing when:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*O'Hair v. White,* 675 F.2d 680, 693 (5th Cir.1982) (en banc) (quoting *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)).

■ For the organization's members to have standing under APA Section 10, they must suffer injury in fact and the alleged injury must be to an interest arguably within the zone of interests to be protected or regulated by the statutes that the agencies were claimed to have violated.

---

**5.** The public notice included the applicant's name; the location, character, and description of project as proposed; that a formal consultation with the United States Fishery and Wildlife Service would be initiated due to the known presence of bald eagles within 2,000 feet of the proposed transmission line alignment; that the land clearing for those portions of wetland would not violate the Clean Water Act of 1977, and that the public was invited to submit comments until June 7, 1979. In addition, the notice stated that a water quality certification would be required; that no properties listed on the National Register of Historic Places were near the proposed work, and that the application would be reviewed pursuant to Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

*SCRAP,* 93 S.Ct. at 2415. Injury in fact is not confined to economic injury, but may include injuries to aesthetics and well-being. *Id.* The injury must be direct, however, and affect the members. *Id.* 93 S.Ct. at 2416.

■ The evidence on standing in this case is admittedly thin, but we find, nonetheless, that the first prong of the *Washington Apple* test is met. The organization's Articles of Incorporation state that the

> [f]urther purposes of the corporation are to explore, enjoy, and preserve the State's wetlands, estuaries, forests, waters, streams, wildlife and wilderness, *especially but not necessarily limited to,* the Lake Maurepas, Ponchartrain, Catherine and Borgue estuary. . . . SOWL is dedicated to work for the improvement of the Louisiana environment in all its aspects, . . .

(emphasis added). A resolution passed by the organization's board in 1978 also indicated that "it is the purpose and intent of SOWL to preserve the Mississippi River and its surrounding waters. . . ." Under *Sierra Club,* this statement in the articles would certainly be insufficient to establish standing, but it is relevant in the consideration of the standing question.

■ During the presentation of the organization's case, Janet Moulton Trombatore, the president, testified that she and her stepson have fished in the general area of the project. She testified that they intend to continue to fish in the area and that the project could have an effect on their fishing. Additionally, the project could harm the aesthetics of the wetlands which would harm Ms. Moulton and the members of the organization who "just . . . ride through there on a pirouge."

Of course, the *fact* of actual damage to the wetlands, fishing and aesthetics is somewhat speculative, but that is the point of the lawsuit—to compel a completion of an environmental impact statement about the consequences of the project.

This interest asserted by the members— the protection of the wetlands environment—would clearly fall within the purpose of the Rivers and Harbors Act, therefore, the first prong is fulfilled. Second, the interests the organization seeks to protect are certainly germane to the organization's purposes as stated in its articles and the resolution already noted. Third, the claim asserted and relief sought do not require the participation of individuals as plaintiffs. Therefore, Save Our Wetlands has standing.

Finding standing under section 10 of the APA, we need not consider LP & L's argument that the organization does not have standing, in the alternative, under section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365.

## III. Standard of Review

■ Involuntary dismissals under Rule 41(b), Fed.R.Civ.Proc., must be affirmed unless the appellant shows that the district court's findings are clearly erroneous or contrary to law. *Reimer v. Smith,* 663 F.2d 1316, 1321 (5th Cir.1981).

## IV. District Engineer's Environmental Assessment

An environmental assessment is a preliminary document in the permitting process. It is a "brief document which provides sufficient information on potential environmental effects of the proposed action . . . to the district engineer, to determine if an [environmental impact statement] is required. . . ." 33 C.F.R. § 230.10 (1982).

Save Our Wetlands contends that the Corps violated its regulatory authority by failing to prepare and sign the environmental assessment. The regulations provide that:

> (4) The District Engineer shall prepare an Environmental Assessment on all applications. The Environmental Assessment shall be dated, signed, and placed in the record and shall include the expected environmental impacts of the proposal. Where the District Engineer has delegated authority to sign permits for and in his behalf, he may similarly delegate the

signing of the Environmental Assessment.

33 C.F.R. § 325.2(a)(4) (1979). The organization argues that the Corps violated this section because the assessment was prepared by Dr. Kilgen, an outside consultant hired by LP & L, and because Colonel Sands, the district engineer, or his designee failed to sign the assessment. The organization notes that "shall" is interpreted to be mandatory, therefore, the district engineer is obligated to prepare the assessment.

■ When LP & L applied for the permit, an assessment of the impact of the proposed project was required. That assessment was to consider "environmental information provided by the applicant, all advice received from Federal, State and local agencies, and comments from the public." 33 C.F.R. § 209.410(e)(7) (1979). Before public notice of the application, the District Engineer was to make a "preliminary assessment" of environmental impacts and a "preliminary determination as to whether the quality of the human environment would be significantly affected." 33 C.F.R. 325.4(b)(1) (1979), *i.e.,* whether an environmental impact statement would be required under Section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. 4332(2)(C). The "preliminary assessment [would] normally be based on experience with similar type activities in the past," and the "preliminary determination" was to be "included in the public notice" and "reconsidered as additional information [was] developed." 33 C.F.R. § 325.4(b)(1) (1979). After the period for comment by interested agencies and the public:

> If the District Engineer's final determination after consideration of all additional information developed (including responses to the public notice) is that the proposed work will not significantly affect the quality of the human environment, the District Engineer's determination shall be documented, dated, and placed in the record *as* his Environmental Assessment.

33 C.F.R. § 325.4(b)(2) (1979) (emphasis added).

Neither the District Engineer nor his designee ever filed a document called an environmental assessment. Charles Decker, the Chief of the Corps' Operations Division in New Orleans, testified to that fact. The Corps, according to Decker, reviewed the environmental assessment compiled by Dr. Kilgen at LP & L's behest, public comments and materials in its file, and filed a finding of fact and a preliminary statement that no environmental impact statement was required.

A fair reading of these regulations, particularly 33 C.F.R. § 325.4(b)(2), discloses that no document *entitled* environmental assessment is required. But the District Engineer is to file his final determination that the proposed project will not significantly affect the quality of the human environment. This final determination shall be documented, dated and "placed in the record *as* his Environmental Assessment." 33 C.F.R. § 325.4(b)(2). This may be signed by the District Engineer's designee.

■ A reasonable interpretation of these two parts of the regulations accords the word "shall" in section 325.2(a)(4) its ordinary mandatory meaning. With corresponding direction it permits the District Engineer to make that "assessment" in the form of a statement that the proposed work does not significantly affect the quality of the human environment.

## V. No Abdication of Agency Role

Our interpretation of the regulations does not result in the agency abdicating its responsibility to appraise a project's import. As long as there is proof of actual agency review, it is not a delegation of authority to an interested party to make an environmental assessment for the Corps.

■ The Supreme Court has interpreted the National Environmental Policy Act, 42 U.S.C. § 4332(2)(c), to create "a discrete procedural obligation on Government agencies to give written consideration of environmental issues in connection with certain major federal actions...." *Aberdeen & Rockfish Railroad Co. v. SCRAP,* 422 U.S.

289, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975). The Supreme Court has again recently instructed that agencies "take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas and Electric Co. v. Natural Resources Defense Council,* —— U.S. ——, ——, 103 S.Ct. 2246, 2253, 76 L.Ed.2d 436 (1983) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)). The role of the judiciary in such cases is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Id.* Both of these cases dealt with "major federal actions," something that we find not involved here, *see* section VI *supra,* however, the instruction to the judiciary in those cases is apt here.

■ The agency acted properly in this case. The district court specifically found that the Corps conducted an independent and thorough review. The record establishes that there was an adequate review and that this finding of fact is not clearly erroneous. The agency is not required "to do it alone" in reviewing the environmental impact of projects. The intent of the controlling regulations is that "acceptable work [completed by parties outside the agency] not be redone, ..." 40 C.F.R. § 1506.5(a) (1979). Therefore, the agency was fully authorized to consider or even adopt the Kilgen Report. It must, however, independently verify the report. The regulations

6. Section 1506.5(a) provides:

*Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent

promulgated by the Council on Environmental Quality specifically state this:

*Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.[6]

40 C.F.R. § 1506.5(b) (1979).[7] The Corps' regulations now say that if an outside consultant or a permit applicant provides an assessment, the district engineer may use it, but is responsible for the "independent verification and use of the data, evaluation of the environmental issues, and for the scope and content of the environmental assessment." 33 C.F.R. § 230.7(e), appendix B ¶ 8(b) (1982).

In reviewing the role of outside consultants in the preparation of environmental impact statements, this court has specifically ruled that an agency may not reflexively rubber stamp a statement prepared by others. *Sierra Club v. Lynn,* 502 F.2d 43, 58–59 (5th Cir.1974), *cert. denied,* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484; 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 701 (1975). In *Sierra Club v. Sigler,* 695 F.2d 957 (1983), this court questioned the objectivity of an environmental impact statement because the record failed to show that the Corps independently evaluated the relevant information. The environmental assessment and the impact statement was prepared by an outside consulting firm in *Sierra Club v.*

of this paragraph that acceptable work not be redone, but that it be verified by the agency.

7. These regulations were promulgated in 1978, 43 Fed.Reg. 55978 (1978), and were generally effective on July 30, 1979. 40 C.F.R. § 1506.12 (1979). They were to apply to "the fullest extent practicable to ongoing activities and environmental documents begun before the effective date," and "nothing" would prevent the agency "from proceeding under these regulations at an earlier time." 40 C.F.R. § 1506.-12(a) (1979). LP & L's permit application was filed on March 19, 1979 and granted on September 24, 1979.

*Sigler.* This extra agency preparation directed the court to a review of the record which would ensure that the Corps "in good faith objectively [took] a hard look at the environmental consequences of the project." *Id.* at 962–63 n. 3 (quoting *Isle of Hope Historical Association, Inc. v. United States Army Corps of Engineers,* 646 F.2d 215, 220 (5th Cir.1981) (per curiam)).

It is clearly stated in the regulations and implicit in the holdings of *Lynn* and *Sigler* that outside consultants may be involved in or even prepare environmental assessments. The key inquiry then is the extent of the Corps' review of Kilgen's assessment. If the Corps independently and carefully reviewed it and verified its data, then the Corps properly performed its regulatory function.

Decker testified during the organization's presentation of its case that "we relied on [the Kilgen Report] heavily; it was prepared by a reputable scientist; it was prepared according to the instructions; it contained the information we told them to have in it. We reviewed it, we supplemented it as necessary so we relied on it, yes." Decker later noted that the Corps presumes that assessments completed by applicants may be somewhat biased. "I don't think this is an important factor, since we do not accept documents as being docile. We review it. If we disagree with all or part of it, we have it done over or supplemented as necessary."

John C. Weber, a zoologist and former Chief of the Regulatory Assessment Section of the Regulatory Functions branch of the Corps' New Orleans' office, testified that he reviewed the permit application. Weber testified that he reviewed the application for approximately three weeks after receiving an initial assessment from Ms. Billie Tramonte. Weber said his recommendation that no environmental impact statement was necessary was based upon the Kilgen Report and other factors. He said he viewed aerial and infrared photographs of the area. He discussed the study with LP & L officials and the Corps' environmental attorney. He applied his own knowledge of the area, wetlands in general, and southern Louisiana. He also asked a staff biologist, Michael Kskaujard, to review Kilgen's assessment. Additionally, he relied upon the administrative file which contained letters from state agencies which expressed no concern about the project. Weber then passed the file to C.J. Nettles, the Operations Division Chief, who made the final determination that no environmental impact statement was necessary.[8]

There is evidence in the administrative record that the Corps investigated the effect of electrical transmission lines on wildlife and also received comments from some organizations about the project. The Corps studied the effects of the project on southern bald eagles and the use of EPA-approved herbicides based upon its own experience in the Salvador Game Management Area. The Corps took into consideration, in consultation with the U.S. Fish and Wildlife Service, the publication "Impact of Transmission Lines on Birds in Flight." Decker flew over the area twice to view the corridor area.

The evidence that the Corps reviewed, verified and supplemented the consultant's report is sufficient to fulfill the Corps' obligation under federal regulations.

The cases relied upon by Save Our Wetlands for the proposition that the Corps has a non-delegable responsibility to make its own objective evaluation are inapposite. These cases, *Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88 (2d Cir.1975); *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860 (5th Cir.1975); *Steubing v. Brinegar,* 511 F.2d 489 (2d Cir.1975); *Citi-*

---

**8.** Save Our Wetlands makes much of the fact that the dates on the documents at issue here seem to indicate that Nettles determined that no impact statement was necessary before Weber sent him the file and the application-related documents. Save Our Wetlands charges that this is proof of the arbitrary nature of the agency review. Decker and Weber testified that they could not explain this discrepancy in dates, but both swore that the dates had to be wrong. Weber suggested that the document signed by Nettles may have been erroneously back-dated, but both testified that Nettles signed the document after Weber's review.

zens *Against Toxic Sprays, Inc. v. Bergland,*
428 F.Supp. 908 (D.Ore.1977), deal with the
failure to complete environmental impact
statements in major federal actions. In
*Ecology Center,* this court ruled that it was
not improper for a federal agency to dele-
gate an impact statement to a state agency.

Finally, the organization also inappropri-
ately relies upon *Bayou St. John Improve-
ment Association v. Sands,* CA 81–1358
(E.D.La.1981). Save Our Wetlands con-
tends that the case holds that the agency
must prepare an environmental assessment
and that this assessment must be a concise
public document. We disagree with the
district court's reasoning in that case. Ad-
ditionally, that case is factually different in
that no assessment was filed, either by an
applicant or by the agency. Here there is a
properly reviewed, verified, supplemented
and adopted assessment.

VI. Environmental Impact Statement

Having found proper the agency's actions
in the development of the assessment, we
also find that the Corps did not err in not
requiring an environmental impact state-
ment. Save Our Wetlands argues that
since the failure to file an environmental
assessment was error, the decision that an
impact statement was not necessary was
premature.

 The standard of judicial review
is whether the agency decision not to devel-
op an impact statement is reasonable and
made objectively and in good faith on a
reviewable environmental record. If the
decision is reasonable, "the determination
must be upheld." *Save the Bay, Inc. v. U.S.
Corps of Engineers,* 610 F.2d 322, 325 (5th
Cir.), *cert. denied,* 449 U.S. 900, 101 S.Ct.
269, 66 L.Ed.2d 130 (1980). The burden is

on the plaintiff attacking the "no impact
statement" decision to show that the quali-
ty of the human environment would be
significantly degraded by the project. *Save
Our Ten Acres v. Kreger,* 472 F.2d 463,
466–67 (5th Cir.1973).

These agency determinations are tested
in court under a "reasonableness" stan-
dard. A reviewing court is to review the
administrative records as well as other
evidence to determine whether the agen-
cies adequately considered the values set
forth in NEPA and the potential environ-
mental effects of the project before
reaching a decision on whether an envi-
ronmental impact statement was neces-
sary. If the agencies engaged in this
analysis and reasonably concluded on the
basis of their findings that an impact
statement was not required, their deter-
minations will be upheld.

*Sierra Club v. Hassell,* 636 F.2d 1095, 1097–
98 (5th Cir.1981).

 Using the administrative record,
the trial testimony, affidavits and deposi-
tions in this case as *Save Our Ten Acres*
did, we find that the plaintiff has not
carried this burden and that the agency has
acted reasonably. Such a finding is implicit
in our holding above that the agency acted
properly and responsibly, objectively and in
good faith, in determining that the permit
application did not raise environmental con-
sequences which required an in-house envi-
ronmental assessment.[9] The organization's
expert witness, Dr. Paul Wagner, testified
that the Corps considered all of the con-
cerns he raised about the project. He testi-
fied that he felt that the Corps did not give
some of the concerns sufficient considera-
tion. The testimony shows that the agency
reviewed the questions raised and found
that they did not significantly degrade the

**9.** Save Our Wetlands does not contend that this
action is a major federal action thus requiring
an environmental impact statement under the
National Environmental Policy Act. 42 U.S.C.
§ 4332(2)(c). We note only in passing that the
record in this case does not show that this
permitting process is sufficient to "federalize"
this action thus requiring an environmental im-
pact statement. *See generally Bradley v. U.S.
Dept. of Housing & Urban Dev.,* 658 F.2d 290

(5th Cir.1981); *Citizens for a Better St. Clair
County v. James,* 648 F.2d 246 (5th Cir.1981);
*Sierra Club v. Hassell,* 636 F.2d 1095 (5th Cir.
1981). A private act does not become a federal
act, albeit a "major" one, merely because of
some incidental federal involvement. *Save The
Bay, Inc. v. U.S. Corps of Engineers,* 610 F.2d
322, 326–27 (5th Cir.), *cert. denied,* 449 U.S.
900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980).

environment. *Save Our Wetlands* failed to carry its burden.

## VII. Consideration of Alternate Routes

Save Our Wetlands argues next that the Corps failed to give full and fair consideration to three alternate routes for the power lines. Alternate route No. 1 would follow an existing non-wetland LP & L right-of-way between Taft and Westwego. Alternate route No. 2 would follow an existing highway right-of-way between Taft and U.S. Highway 90 along Louisiana Highway 3127. At Highway 90, alternate route No. 2 would pick up the proposed right-of-way. Alternate route No. 3 follows the proposed right-of-way up to mile point 11.2, at which point it picks up an existing canal right-of-way, follows it for seven miles, and then rejoins the proposed corridor at mile point 19.0.

The organization concentrates its attack on the Corps' failure to select alternate route one. We are not here to decide if the alternative or the actual route is better suited. We need only decide if the Corps has complied with its duty under the law. The applicable regulation requires that:

The applicant must provide sufficient information on the need to locate the proposed activity in the wetland and must provide data on the basis of which the availability of feasible alternative sites can be evaluated.

33 C.F.R. § 320.4(b)(4) (1979).

The findings of fact issued by Colonel Sands state that "[o]ther routes are possible, but the applicant has demonstrated that the one proposed has the greatest overall feasibility."

It seems evident that the determination of whether a need exists to locate the power lines in the wetlands is intertwined with the feasibility of other routes. LP & L contends that more electric power is needed for the New Orleans metropolitan area. Additional power is available at Taft through the Waterford-Gypsy generating complex and the existing southern terminus of LP & L's 500 kilovolt transmission system. To get the power to New Orleans requires the construction of a transmission line through a portion of Louisiana which has a large area of wetlands. If the alternate routes are not feasible, then LP & L properly chose to locate some of the transmission line corridor in wetlands.

Save Our Wetlands contends that before the permit can be issued, the District Engineer must decide:

1. Whether the benefits of the proposed wetland alteration outweigh the damage done to the wetland resource;

2. Whether the proposed alteration is necessary to realize those benefits;

3. Whether, on the basis of information supplied by the applicant, it can be shown that the proposed activity is primarily dependent upon being in, or in close proximity to, the aquatic environment; and

4. Whether, on the basis of data supplied by the applicant, it can be shown that no feasible alternative sites for the project are available.

33 C.F.R. § 320.4(b)(4) (1979).

While the first two questions are not specifically answered by the District Engineer, the answer is implicit in his decision to grant the permit. To grant the permit is to decide that the benefits of the proposed project outweigh the damage.[10] Addition-

---

**10.** The Corps did, nonetheless, make some findings as to the benefits-damages analysis. The Corps specifically noted that it considered the impacts of the total project and not just the crossings for the small tidal streams. It found that despite energy conservation, additional power supplies are needed to insure proper service to the areas served by New Orleans Public Service and LP & L. It found that there are no reasonable alternatives available to the applicant that will achieve the purpose for which the work is being constructed. It deter-

mined that while other routes are possible the proposed route has the greatest overall feasibility. It found that the proposed work is in accordance with the overall desires of the public as reflected in comments of State and local agencies and the general public. It found that there are no truly significant adverse environmental effects related to the work. Finally, it found that, on balance, the total public interest should best be served by the issuance of a

ally, the third requirement is subsumed in the fourth if no alternative routes are feasible and the area to be traversed is dominated by wetlands.

Therefore, our review is limited to whether (1) LP & L provided data on the basis of which the availability of feasible alternative sites could be evaluated, and, (2) whether the District Engineer considered feasible alternative sites. The district court found that the administrative record contained the information and analysis necessary. The record discloses that LP & L provided the Corps with sufficient information. The District Court found as fact that the Kilgen Report contained feasibility data and comparisons of alternate routes. This comports with our review of the materials and thus answers the first question in the affirmative.

Our review also shows us that the Corps considered the feasibility of the three alternate routes. The District Engineer rejected alternate route one because it went through a high-use residential and commercial area. The Corps found that the acquisition of additional rights-of-way would dislocate a substantial number of residents and commercial establishments. The Corps also determined that the stringing of additional power lines along the established route would be an unsound engineering practice because of the increased danger of power outage due to hurricanes and tornadoes moving through the area. Alternate two was dismissed as "unaesthetic and environmentally unacceptable," because the lines would be run along a new highway. The third possible route was rejected because it would run closer to the feeding area of thousands of lesser scaups or ducks and would ruin the aesthetic value of the levees lining the canal.

■ The record shows, in addition, that the Corps conferred with Louisiana state agencies about the different possible routes. The proposed route proved to be most acceptable to the Louisiana Wildlife and Fisheries Commission. The Corps conferred with that agency and with the U.S. Fish

and Wildlife Service about the effect of the route on a nearby bald eagle's nest. The agency conferred with the officials of the Salvador Game Management Area, the National Marine Fisheries Service and the Louisiana Stream Control Commission. There is no blind acceptance here of a route simply because it was the primary one proposed by LP & L. There is no doubt that LP & L has acquired the right-of-way along the proposed route, but we find no evidence that it was presented to the Corps as a *fait accompli.* It is a factor that may be and was considered by the Corps in evaluating the alternate routes.

Finally, Save Our Wetlands argues that the Corps could not properly assess the alternative without viewing the costs of the alternate routes. The Corps' representatives testified at trial that requests for cost data are made on a case-by-case basis. Additionally, they determined that cost estimates were not necessary here because they felt they had sufficient non-cost data to evaluate the merits of the alternate routes. It apparently seemed clear to Corps' officials that alternate route one, in particular, would be more costly because of the need to acquire a right-of-way through a developed area.

We are confident that the Corps fully considered the suggested alternate routes before approving the proposed transmission line corridor.

## VIII. Failure to Require a § 404 Permit

■ Save Our Wetlands argues that the Corps erred in not requiring LP & L to acquire a § 404 permit. The organization contends that the permit is required because the work to clear the corridor results in the discharge of dredged and fill material into the waters of the United States. It argues that the decision of Judge Scott in *Avoyelles Sportsman's League v. Alexander,* 473 F.Supp. 525 (E.D.La.1979), should control this issue.

The statute requires the issuance of permits where there is a "discharge of dredged

Department of the Army permit to the applicant.

or fill materials into the navigable waters." 33 U.S.C. § 1344. There is no question that the wetlands constitute navigable waters, 33 C.F.R. § 323.2(2) (1979), therefore, the question is whether the work involved in this project is "dredge and fill" work.

The Clean Water Act does not define "dredged or fill material," but leaves the term for agency definition. The Corps defines "dredged material" as "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(k) (1979). The Corps defines "fill material" as

> any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a water-body. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under [33 U.S.C. § 1342].

33 C.F.R. § 323.2(m) (1979). The "materials" here do not qualify as dredged or fill materials under these definitions. The definition of fill material highlights the fundamental difference that exists between this case and the *Avoyelles* decision.

The work in *Avoyelles* was intended to permanently change the area from wetlands into a non-wetland agricultural tract for row crop cultivation. All timber and vegetation were to be cut and cleared. The area was to be drained and leveled. Trees and other vegetation were to be burned and the ashes disced into the land. Nonburnable materials were buried on the plot. It was within this factual setting that the *Avoyelles* court found that a permit was required. One of the key elements behind Judge Scott's decision was the fact that the work would destroy the wetlands.

Here, the work involved the felling of trees with chain saws. The trees and cleared vegetation were to be windrowed and allowed to naturally deteriorate. The wooded swampland to be cleared here will be changed to swampland vegetation with shrubs, grasses and other low growth. The wetlands involved here will not be converted as in *Avoyelles*. The trees and vegetation to be windrowed will not be used to

"replac[e] an aquatic area with dry land or ... chang[e] the bottom elevation of a waterbody." Additionally, no access roads will be built to the corridor. All work will be done from marsh buggies and helicopters.

We find, therefore, that the Corps' decision not to require a 404 permit was neither arbitrary nor capricious. Our decision on the merits of the section 404 claim removes the necessity of deciding whether Save Our Wetlands was proceeding under section 505 of the Clean Water Act, 33 U.S.C. § 1365. If the organization was proceeding under this section, then it would be able to recover attorneys' fees and costs for the litigation of the section 404 permit claim. Since Save Our Wetlands did not prevail on this claim, it is unnecessary to decide its eligibility for fees under section 505.

The district court's decision is

AFFIRMED.