SAVE OUR WETLANDS, INC.

v.

Eugene S. WITHERSPOON, District
Engineer, New Orleans District
Corps of Engineers, et al.

Civ. A. No. 86–2554.

United States District Court,
E.D. Louisiana.

July 10, 1986.

Luke Fontana and Lyman L. Jones, Jr., New Orleans, La., for plaintiff Save Our Wetlands, Inc.

Mark Gallinghouse and Elizabeth Griffin, U.S. Attys. Office, New Orleans, La., for defendants Eugene S. Witherspoon, Dist. Engineer, New Orleans Dist. Corps of Engineers, Dept. of the Army.

Van M. Davidson, Jr. and William W. Ruckers, Jr., Camp, Carmouche, Barsh, Gray, Hoffman & Gill, Lake Charles, La., for defendant ARTRA Resources Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATRICK E. CARR, District Judge.

Plaintiff, Save Our Wetlands, Inc. (SOWL), a non-profit group of conservationists, hunting and wildlife enthusiasts, commercial fisherman and trappers, and others, brought suit against Eugene S. Witherspoon in his capacity as District Engineer of the New Orleans District Corps of Engineers, Department of the Army (Corps) and ARTRA Resources Corporation seeking declaratory and injunctive relief in regard to the issuance of three (3) dredging permits sought by ARTRA. The matter came on for hearing on the motion for preliminary injunction on July 1, 1986. After two and one half days of testimony and evidence, by express agreement, the parties submitted the case on the merits. Now, upon consideration of the pleadings, the testimony of the witnesses, the documentary evidence, post-trial memoranda and the law applicable to this case, the Court renders its findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346 and under the Clean Water Act, 33 U.S.C. § 1251, *et seq.*

This controversy arises out of the issuance of dredging permits by the Corps to ARTRA Resources Corporation, the lessee of oil and gas mineral exploration rights from Lutcher Moore Cypress Lumber Company. The Lutcher Moore tract comprises 64,500 acres of cypress swamp land located in the Maurepas/Ponchartrain/Borgne Basin, north of Mt. Airy and Reserve, Louisiana. Three permits are at issue, affecting a total of 54 wetland acres.

**PERMIT NO. 1: LMNOD–SE (RESERVE RELIEF CANAL) 7**

ARTRA applied for a permit to perform work in the vicinity of the Reserve Relief Canal located approximately 7.9 miles northwest of Laplace, Louisiana in St. John the Baptist Parish, affecting 21 acres of wetlands. ARTRA proposed to dredge and maintain one 3849 foot by 60 foot access canal and a 368 foot by 160 foot slip area, for the purpose of gaining access to oil and gas drilling exploration and production operations. The proposal required the excavation of approximately 85,884 cubic yards of forested wetland and marsh material (spoil), which would be placed as a continuous levee around the slip. Approximately 1,333 cubic yards of waterbottom at the mouth of the Reserve Relief Canal would also be excavated and placed in open water with the resultant decrease in water depth of no more than 0.5 foot.

The proposal also called for the placement of a pollution boom across the mouth of the slip area during drilling and completion operations. If the well was producible, the pollution boom would encircle the wellhead and production equipment. If the well was not producible, the mouth of the access canal would be plugged and the spoil bank gapped. Mitigation also included revegetation of the spoil banks at the project site.

Of primary concern was the fact that there were two active and one abandoned bald eagle nests in the vicinity of this proposed activity. In order to protect the public interests regarding this endangered species, the United States Fish and Wildlife Service (USFWS) recommended that three restrictions be incorporated into the permit. ARTRA voluntarily agreed and requested the Corps to so incorporate these restrictions. The Corps did so as follows:

1. Dredging and drilling activities shall be limited to the period May 15 through October 1 of any year.

2. No work requiring the utilization of heavy equipment shall be conducted during October 1 through May 15 of any year (the only exception will be emergency work coordinated with the U.S. Fish and Wildlife Service).

3. All drilling equipment shall be removed from the area by October 1 during the year of drilling.

See Exhibit P–1, pp 60, 33 and 95.

A fourth restriction was not incorporated by the Corps into the permit, but rather supported by the Corps and voluntarily agreed to by ARTRA. This restriction involved performance of off-site mitigation measures to "compensate for unavoidable habitat losses." See Exhibit P–1, pp 60 and 95.

Based upon a short form Environmental Assessment (EA), a finding of no significant impact, and a finding that no Environmental Impact Study (EIS) was required, the permit for the Reserve Relief Canal issued on June 6, 1986. Suit was filed on June 18, 1986. The work under the permit was completed on June 25, 1986, prior to the commencement of trial. At the conclusion of trial on the merits, defendant ARTRA notified the Court that it would voluntarily suspend all operations in the area pending the final decision on the merits.

PERMIT NO. 2: LMNOD–SE (ST. JAMES PARISH WETLANDS) 39

This permit application involved work located approximately 6 miles north of Mt. Airy, Louisiana in St. James Parish, affecting 14 acres. ARTRA proposed the cleaning out of approximately 2,000 feet of the existing Bourgeois Canal with the 9,800 cubic yards of spoil to be placed onto the existing spoil bank. Further, ARTRA proposed to construct a 2,300 foot canal and slip area by dredging approximately 53,793 cubic yards of swamp material for the purpose of accessing a proposed oil and gas well site. The proposal called for the spoil to be placed as a continuous levee around the slip and a levee along the canal with 50 foot breaks or gaps every 500 feet. It would also be gapped at existing streams, sloughs and bayous.

A pollution boom would be required to be placed across the mouth of the slip during drilling and production operations. The mouth of the canal would be plugged in the case of a dry well or upon abandonment. Again, on-site mitigation included revegetation of the spoil banks. Off-site mitigation was again agreed to by ARTRA.

At the time suit was filed, the Court was informed that permit issuance was imminent. On the final day of the hearing, the permit was issued by the Corps and received by ARTRA. The same day, the Corps suspended the permit indefinitely pending the final decision on the merits.

PERMIT NO. 3: LMNOD–SE (MISSISSIPPI BAYOU) 1

As to this third project ARTRA proposed to dredge a 60 foot by 800 foot channel in Lake Maurepas to access Dutch Bayou. Further, ARTRA proposed sweeping the existing Dutch and Mississippi Bayous as necessary to access a proposed canal and slip. ARTRA sought to dredge and maintain a 3,475 foot by 60 foot access canal and a 350 foot by 160 foot slip area. The site of the proposed location is approximately 7.3 miles northwest of Reserve, Louisiana affecting 20 acres of wetlands.

The new construction called for the excavation of 81,052 cubic yards of swamp material for the proposed canal to be placed as a continuous levee around the canal and slip areas. A pollution boom would be placed across the mouth of the slip during drilling and production operations. A producible well would require the placement of a pollution boom encircling the wellhead and any production equipment. A non-producing well or abandonment would require the plugging of the mouth of the access canal.

As to the dredging of Dutch Bayou to a depth of eight feet, approximately 3,000 cubic yards of spoil would be placed randomly on the bank of the existing bayou. The dredging of Mississippi Bayou would require the placement of approximately 7,000 cubic yards of spoil randomly on the existing bank.

Subsequent to ARTRA's initial application, the excavation figures for Mississippi and Dutch Bayous were substantially revised requiring additional excavation to implement the project and access the proposed oil and gas drilling site. Hence, the Corps has required the resubmission of the application. No public notice or environmental assessment has been done and no final agency action has occurred concerning this third project. *See* Exhibit P–3.

THE CHALLENGE

Plaintiff SOWL challenges the issuance of the permits on two grounds:

1. SOWL asserts that there was a "complete and abject failure" to comply with the assessment requirements of the Corps regulations and the Clean Water Act, specifically 33 C.F.R. § 320.4 and 40 C.F.R. § 230.10. SOWL asserts that the permitting process was inadequate in failing to consider the cumulative impact of these projects on the Maurepas Basin and in failing adequately to consider alternatives available to the proposed projects.

2. SOWL asserts alternatively that the finding of no significant impact was arbitrary and unreasonable. SOWL urges that an EIS should have been required due to the fact that the proposed activities present a "substantial likelihood of serious ongoing environmental harm."

*See* Plaintiff's Post-Trial Memorandum at pp 1–3.

THE REGULATIONS

The National Environmental Policy Act (NEPA) requires a federal agency contemplating a "major Federal Action" which "significantly" affects the quality of the human environment, to prepare an EIS prior to commencement of the project. 42 U.S.C. § 4321, *et seq.;* 40 C.F.R. §§ 1500.3, 1501.3, 1501.4, 1502.3. "Major Federal Action" includes projects such as the ones in the case at bar where federal agency approval through permit is required. 40 C.F.R. § 1508.18(4). "Significantly" as used in the regulations, requires the agency to consider both the context of the action and the intensity of the impacts, in-

cluding cumulative impacts. 40 C.F.R. § 1508.27.

Not all major federal actions require the preparation of a complete EIS. An EIS need not be prepared if the project is found not to significantly affect the quality of the human environment. 40 C.F.R. § 1501.4. If on the basis of an EA, the agency determines not to prepare an EIS, it must issue a document showing a "finding of no significant impact. 40 C.F.R. §§ 1501.4, 1508.-13.

The issuance of dredging permits by the Corps of Engineers is further regulated by 33 C.F.R. § 320, *et seq.* Specifically, § 320.4 provides:

§ 320.4 General policies for evaluating permit applications.

The following policies shall be applicable to the review of all applications for Department of the Army permits. Additional policies specifically applicable to certain types of activities are identified in Parts 321–324.

(a) *Public interest review.* (1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impacts which the proposed activity may have on the public interest requires a careful weighing of all those facts which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All facts which may be relevant to the proposal must be considered including the cumulative effects thereof. Among those are conservation, economics, aesthetics, general environ-

mental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership, and, in general, the needs and welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines or criteria (See §§ 320.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

(2) The following general criteria will be considered in the evaluation of every application:

(i) The relative extent of the public and private need for the proposed structure or work:

(ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and

(iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work may have on the public and private uses to which the area is suited.

(b) *Effect on wetlands.* (1) Some wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest. For projects to be undertaken by Federal, state, or local agencies, additional guidance on wetlands considerations is stated in Executive Order 11990, dated 24 May 1977.

(2) Wetlands considered to perform functions important to the public interest include:

(i) Wetlands which serve significant natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species;

(ii) Wetlands set aside for study of the aquatic environment or as sanctuaries or refuges;

(iii) Wetlands the destruction or alteration of which would affect deterimentally natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;

(iv) Wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs and bars;

(v) Wetlands which serve as valuable storage areas for storm and flood waters;

(vi) Wetlands which are prime natural recharge areas. Prime recharge areas are locations where surface and ground water are directly interconnected; and

(vii) Wetlands which through natural water filtration processes serve significant and necessary water purification functions.

(3) Although a particular alteration of wetlands may constitute a minor change, the cumulative effect of numerous such piecemeal changes often results in a major impairment of the wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area. In addition, the District Engineer may undertake reviews of particular wetland areas in consultation with the appropriate Regional Director of the Fish and Wildlife Service, The Regional Director of the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration, the Regional Administrator of the Environmental Protection Agency, the local representative of the Soil Conservation Service of the

Department of Agriculture, and the head of the appropriate state agency to assess the cumulative effect of activities in such areas.

(4) No permit will be granted which involves the alternation of wetlands identified as important by paragraph (b)(2) of this section or because of provisions of paragraph (b)(3) of this section, unless the district engineer concludes, on the basis of the analysis required in paragraph (a) of this section, that the benefits of the proposed alteration outweigh the damage to the wetlands resource. In evaluating whether a particular discharge activity should be permitted, the district engineer shall apply the section 404(b)(1) guidelines (40 C.F.R. 230.-10(a)(1), (2), (3)).

 \* \* \* \* \* \*

The Clean Water Act regulations, incorporated into the foregoing requirements provide at 40 C.F.R. § 230.10:

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alpernative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in Subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

Hence, under the foregoing regulations, the Corps must perform a "public interest review" to determine if a proposal would have a "significant" effect on the quality of the human environment. Included in this review is a consideration of alternatives to the proposed activity and the cumulative impact of the proposed activity on the environment.

## JUDICIAL REVIEW OF FINAL AGENCY ACTIONS

 The case law in this Circuit has established that the role of the judiciary in reviewing agency action is not to substitute the Court's judgment for that of the Agency. *Fritiofson v. Alexander,* 772 F.2d 1225, 1238 (5th Cir.1985). "The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and made in good faith on a reviewable environmental record." *Louisiana v. Lee,* 758 F.2d 1081, 1083 (5th Cir.1985) [quoting

*Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 644 (5th Cir.1983) ].

■ Under this standard the court must determine

whether the plaintiff has alleged facts which, if true, show that the recommended project would materially degrade any aspect of environmental quality.

\* \* \* \* \* \*

[If the plaintiff] raise[s] substantial environmental issues concerning the proposed recommended project ..., the court should proceed to examine and weigh the evidence of both the plaintiff and the agency to determine whether the agency reasonably concluded that the particular project would have no effects which would significantly degrade our environmental quality ... If the court concludes that no environmental factor would be significantly degraded by the project, [the agency's] determination not to file the impact statement should be upheld. *On the other hand, if the court finds that the project may cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement or grant [the plaintiff] such other equitable relief as it deems appropriate.*

*Citizen Advocates for Responsible Expansion v. Dole*, 770 F.2d 423, 432 (5th Cir. 1985) [quoting and adding emphasis, *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 466 & 467 (5th Cir.1973) ].

■ In applying the reasonableness test, the Court may determine that the

... decision to forego preparation of an EIS [is] unreasonable for at least two distinct reasons: (1) the evidence before the court demonstrates that, contrary to the [Finding of No Significant Impact], the project *may* have a significant impact on the human environment, [citation omitted], or (2) the agency's review was flawed in such a manner that it cannot yet be said whether the project may have

a significant impact, [citation omitted]. The appropriate relief, moreover, depends upon which of these findings the district court makes. If the Court finds that the project may have a significant impact, the court should order the agency to prepare an EIS. [citations omitted]. If the court finds, on the other hand, that the EA is inadequate in a manner that precludes making the determination whether the project may have a significant impact, the court should remand the case to the agency to correct the deficiencies in its analysis.

*Fritiofson*, 772 F.2d at 1238 [emphasis in original].

■ As clearly explained in *Dole*, supra, "the plaintiff has the initial burden of alleging facts that show a project would affect significantly some human environmental factor." 770 F.2d at 432. Crossing this threshhold, the case proceeds and the Court receives the evidence of the parties. After receipt of the evidence, the Court "must assess the reasonableness of the agency's determination *on the basis of the information before the agency at the time the decision not to prepare an EIS was made.*" *id.* 433. (emphasis added).

■ The federal regulations affirmatively require the agency to document the information considered at the time the conclusion to forego the preparation of an EIS is made. *id.* at 433–34. An EA and a Finding of No Significant Impact need not contain the extensive detail of an EIS; however, "mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS." *Id.* The record which the Court must review is that in existence *at the time* the agency made its decision. "*Post hoc* rationalizations" in the form of studies, statements, opinions, reports, affidavits and other documentary evidence, offered at the time of trial, must be viewed critically and ordinarily are not considered part of the administrative record. *Dole*, 770 F.2d at 434. *Citing, Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

U.S. 402, 419 and 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

## THE INSTANT CASE

First, the Court must emphasize its disappointment with the administrative records prepared by the Corps of Engineers on these three projects. *See* Exhibits P–1, 2 and 3. Faced with these records alone, the Court would have had no choice but to enjoin all activities and remand the matters for the preparation of a reviewable record. The records are replete with broad conclusory language that the effects on the environment were considered and found to have no significant impact. With few exceptions, the information upon which the environmental assessment was made is blatantly absent from the records. Neither do the records refer the reader to other sources from which the conclusions were made.

For example, for both the Reserve Relief and St. James Parish Canal projects, the conclusion is made that "there are no reasonable alternatives available." *See* P–1 at p. 96; P–2 at p. 87. The only documentation in the records to support this conclusion is a report that a directional drilling meeting was held and it was determined that no alternatives to the projects were available. *See* P–1 at pp. 3–5; P–2 at pp. 50 and 77. There is no documentation of what alternatives were considered and why those alternatives were impractical.

Another example of the numerous flaws found in the administrative records is the difference in methodology employed by the civil engineering technicians in completing the preliminary analysis. In the Reserve Relief Canal analysis, the technician merely "checked off" items as deemed appropriate. *See* P–1 at p. 92, items 1 through 20. In the St. James Parish Canal preliminary analysis, the technician "checked off" some items and marked other items as "N", nonsignificant. *See* P–2 at p. 77, items 1 through 20. Additionally, there is a complete absence of documentation in the records to support the findings of these technicians. With but a few exceptions, it appears that these items were determined arbitrarily.

Finally, concerning the issue at the heart of this lawsuit, the Reserve Relief Canal EA concludes: "Cumulative impacts were considered significant only within the localized area around the project site. They have not yet been identified as significant basinwide." P–1 at p. 93. Interestingly, the St. James Parish Canal EA concludes: "This project would contribute to the cumulative loss of wetlands in the Maurepas Basin. This contribution is not significant. At some point in time these wetland losses may become significant, however, based on our knowledge, this threshold has not been reached." P–2 at p. 78. The Court searched the administrative records in vain for documentation in support of these conclusions.

As permitted, the Corps did however, supplement these administrative records through evidence submitted at trial. The testimony of the witnesses, convinces the Court that in fact all factors required by the regulations were considered by the Corps in making its determinations. Further, although the documentation is woefully lacking in the administrative records, the Court finds that the Corps has demonstrated adequate support for the conclusions reached. Hence, plaintiff SOWL fails in its assertion that the Corps failed to adequately follow its regulations in considering alternatives and cumulative impacts. The administrative records state, and the trial testimony supports those statements, that in fact cumulative impacts and alternatives were considered prior to issuing the finding of no significant impact. This is all that is required by the regulations.

The plaintiff's contention that the finding of no significant impact and the decision to forego preparation of an EIS were arbitrary and unreasonable must also fail. Not one of the experts who testified on behalf of the plaintiff had studied the Maurepas Basin itself. Although all were well qualified in their fields, and all of the

**1166**

experts had made studies of various wetland areas, none of the areas studied were similar in environmental structure to the area affected by these three projects. It is also noteworthy that none of plaintiff's experts had made an on-site inspection of the area in question. In spite of this, all of these experts concluded that the projects would have a serious and significant impact on the Maurepas Basin.

On the other hand, the experts who testified on behalf of the defendants were familiar with the precise locations in question and had performed studies in the area and in other similar environments. Defendants' experts had made on-site inspections of the project areas. Further, the Court must give more credence to the testimony of the expert hydrologist concerning the effects on the water movement in the area, than to the testimony of plaintiff's experts who were not qualified hydrologists.

The overwhelming conclusion of defendants' experts was that which was stated in the administrative records: The projects would have an obvious significant localized impact. Some localized impacts would be immediately adverse but beneficial in the long term. The overall cumulative impacts on the Maurepas Basin were found to be non-significant but beneficial in most respects. These conclusions were amply supported.

Therefore, the Court finds that the Corps acted reasonably in concluding that there would be no significant impact on the environment and in deciding to forego preparation of an EIS. The Court would note that it did consider enjoining further activity in the Reserve Relief and St. James Parish Canals and remanding these matters to the Corps for preparation of a reviewable record. However, the Court determined that this would be an impractical, costly, and pointless exercise. The result would have been to simply delay the ultimate finding that the Corps reasonably concluded that there was no significant impact and would have required the Court to completely ignore the credible testimony of the experts offered at trial. The Court would

also note that it is unable to review the Mississippi Bayou project for the reason that such review would be premature pending final agency action on the project.

Based upon the foregoing, the Court finds that plaintiff's request for declaratory and injunctive relief must be DENIED.

Judgment shall be rendered accordingly.